Okay, our final argument this morning is ADPLLC v. Nicole Rafferty and ADPLLC v. Christy Mort, numbers 181796 and 182603. We'll hear first from Mr. Lowe. Good morning, Your Honors. May it please the Court. My name is Tim Lowe. I represent the appellant in both of these cases, ADPLLC. I would like to reserve five of my 20 minutes for rebuttal. Your Honors, we're here today on ADP's appeal of two motions for preliminary injunction, one in each case. Both Ms. Rafferty and Ms. Mort are former ADP employees who agreed to restrictive covenant agreements by their acceptance of a restricted stock award that they received because of their performance at ADP. I try to get something off the table. Perhaps you'll disagree, but it's my understanding that in the cases that you've won, because you've had many of these cases, there was blue penciling out of the restrictive covenant of the prohibition against working for clients for whom the employee had not previously worked or serviced when the employee was at ADP. Is that right? There have been many different cases. I guess I'll start there. I didn't phrase that question very well. Let me try it this way. Do you agree that we're not supposed to evaluate the enforceability of the restrictive covenant by assuming that the employee is prohibited from working in the same territory as she was previously working for any potential customer? Well, under the restrictive covenant agreements that both of these defendants agreed to, there's a non-compete provision which would prevent them from working for a competitor in their former territory, which we contend they are both doing. There's also a non-solicitation provision. The non-solicitation provision of customers has two components. There's a non-solicitation of current customers and then also of prospective customers. I think all of the courts that have at least enforced the agreement, I guess when I say it that way, I'm not thinking about the three clients of trade. But in the other cases, in the federal cases where preliminary injunctions were granted, the Bansheer case in Tennessee and then the three cases before Judge Moore in New Jersey, all of those cases have enforced some form of the restrictive covenant related to current clients. None of them have enforced it with respect to all prospective clients, except for those that the defendants learned about or dealt with while they were at ADP. So our position in these cases has been that, in these two in particular, when we sought the preliminary injunctions, we were seeking to enforce the non-compete, so keep the defendants from working in their territory, their former territory for ADP, where they are at least in part currently working for ADP clients. But with respect to the non-solicitation of prospective clients, we are only seeking, because we believe it's a reasonable restriction on the agreement, only seeking to enforce them from contacting prospective clients that they would have dealt with while they were at ADP. All right. So I think that helps to narrow the issue here. And so I want to focus on the non-compete provision. New Jersey law says you can't just restrict competition for the sake of restricting competition. It needs to be serving some other goal, trade secrets, goodwill, relationships, client relationships and things. The problem is the courts that have ruled against you, Judge Linares has suggested, well, the other two agreements, the NDA and the SRA, the Sales Representative Non-Disclosure Agreements, already do that. And I might add, well, maybe we could even give you the, you know, if Part 4 of the Restricted Covenant Agreement is valid, the non-solicitation agreement subject to the blue non-compete on top of all of those things in order to protect trade secrets they already can't disclose, goodwill and customer relationships that are protected by saying you can't deal with any of the people you've had relationships with before. Sure. And I think it's looking at varying levels of what the former employee can do with respect to the competition against ADP. So we've got the first agreement that you referenced, the Sales Representative Agreement and the Non-Disclosure Agreement that would only prohibit them from soliciting clients that they've dealt with and prospective clients that they've dealt with. And so that is a base agreement that all salespeople have to sign. As they progress in their careers, they learn about more clients, they learn more confidential information from ADP, they learn how to use it better. That's when they can qualify for the stock awards. And in exchange for receiving the stock award, we have the additional restrictions. The non-compete is important because not only does that prohibit the former employee from soliciting clients of ADP in the territory, but it prohibits them from competing at all in the territory because they think that their own ADP when they go to the competitor. It may not just be with a client of ADP if they contact a client, for instance, Ms. Rafferty in Boston. If she contacts a client of ADP in Boston, certainly she can put forth all the arguments about why they should leave ADP and go to Ultimate. But if she contacts someone who's not a client, not a prospect that she dealt with in the Boston area, she may have more cachet because she's in Boston. And so that's why that is important. Cachet, I don't follow this well enough. If New Jersey cases say the fact that they've got human capital, that they've got experience, etc., is not by itself the kind of harm you're allowed to protect against. Competition is not. I don't follow. Is cachet another way of talking about goodwill? In which case, what's the causal link here between having worked for ADP and causing cognizable harm to ADP after they leave that requires the non-compete for 12 months for the whole territory? Sure. And cachet, I think you're right, is probably not the best word. Goodwill, the relationships that the former employees have developed, not only with customers, but with referral sources. A lot of times these referrals come in through perhaps an accountant or some other type of referral source that can refer a client who needs a payroll provider or a human resources provider. Those relationships are likely stronger in the territory where the employee used to work. Why is that in the category of knowledge, skill, expertise, information that New Jersey Supreme Court has said in Ingersoll ran are not legitimately controlled by the former employer through a restrictive covenant? But these would be relationships that were developed, in this case, while they were restricting, maybe not the general knowledge. You're right. The case law doesn't allow that to be protected. But relationships that they developed on behalf of ADP, they can't then go use those relationships. They can't convert the company goodwill to personal goodwill. Exactly. All right. But how does that help you with the geographic prohibition? Because if Rafferty's the one up in New England, and Mork's in Chicago. I mean, if Rafferty wants to prospect in New England, and she wants to prospect clients that are not ADP clients, I mean, why should we enforce that? Because there she's not converting her personal goodwill. Excuse me. She's not converting the corporate goodwill that she earned while working for ADP into her own personal goodwill or into ultimate goodwill. There, under the hypothetical IPOs, all she's doing is using her knowledge, skill, efforts to try to get clients for her new employer. But she may be competing against ADP in that territory, even if it's not an ADP client. And that's why we then have the non-solicitation restriction that's broader. So the interest that's being protected is different. But in Ms. Rafferty's case, it would only be a portion of her current ultimate territory where we would say she could not work for ultimate. If the interest is simply to prevent competition with your client, aren't we in the territory of illegitimate interest? But the interest is not to protect competition. It's to protect the client relationships, the referral relationships, the confidential information that these defendants learn about ADP. I forgot to explain how that applies in a territorial non-compete. I thought your answer to Judge Hardiman was that by competing in the same territory, even if it had nothing to do with the client, current, former perspective of ADP, it is offering competition to ADP for the same client. And that is the interest in preventing the employee from competing in that territory. The interest is protecting the confidential information and the client relationships. There's just different ways of doing it. I think that's the line we need to pursue. What are the different ways of doing it, right? Your adversary's best argument is, and Judge Linares, that these other agreements and the other provisions, you can ban solicitation, you can ban using confidential information, trade secrets. All of that is dealt with with other agreements. I'm wondering, how do violations of those provisions come to your attention? How do you know when they're being violated? Are there violations that remain hidden such that nothing short of a prophylactic ban is going to be enforceable here? I'd like to understand your experience. I don't know if you've litigated these cases for ADP across the country, but how typical are you finding out that someone's using a client or something like that? Well, I'll answer that by making the first statement that that's why injunctions in these cases are so important, because a lot of times you don't know. We may find out during the course of litigation that an ADP client in these cases left and went to Ultimate, and that the defendant solicited that company. You may on rare occasions find out, and this when they leave. They may say that they have decided to leave and go to a particular client or, excuse me, a particular competitor of ADP. You may find out just by word on the street via referral sources. But in many instances, it's difficult to find out. And when I said that's why the injunction is so important, it's because that's why the harm here is irreparable. I don't know. I don't know why you pull the injunction trigger so quickly, sort of presumptively and prophylactically. I mean, I guess that's a business decision your client makes. But why not assume that the people that have taken advantage of these stock benefits actually adhere to the restrictive covenants and trade secret confidentiality and other provisions that you locked them into at the time that you offered them the sweetener? I want to make sure I understand the question. Why don't we presume that they're adhering to the agreements until we find out that they're not? Yeah. Well, I guess what I'm asking is, is it the company's practice that as soon as somebody who signs one of the restrictive covenant agreements leaves that you automatically run to court and try to get an injunction against them even before you have any inkling that they're violating those contracts? Well, I can speak to my own experience that that is not the practice. Once there is a violation, then ADP seeks to enforce that. So in these cases, these in particular, we know that the defendants are working for Ultimate. We know that they're working in the same territory. So that is a violation. So that's a violation and you just don't know what that means in terms of loss of business, et cetera? That's right. That's right. What do we do with the fact that the declaration here, what you put forward and what's in the record as to the interest at stake, say explicitly that it's because of the unique knowledge, skill, and job performance of these employees, which seems to be language that almost verbatim tracks what the Supreme Court has said are not legitimate interests in that in the declaration that as these employees gain experience, they're going to learn how to sell ADP's products better and then therefore learn how to sell against the products better. They're going to learn about pricing strategies, product updates, things of that nature that they may be able to use against ADP because they know what's coming down the line when they leave. But wasn't that exactly the point of the New Jersey Supreme Court, that that becomes part of the employee, that kind of general experience, expertise, knowledge, and if it does not involve proprietary information or particular great secret confidential information, you can't identify that as a legitimate interest to enforce some restriction to those components? If we're talking about basic sales training, how to become a salesperson, things of that nature, I think those might fall under the category of general experience that you can't really separate from the person. But when we're talking about how ADP prices its products, that's not something that I think becomes a part of the salesperson that they can just come and take and use against ADP in the future. That, many cases I think would say protect that type of information, a lot of the cases that we've cited are briefing. All right. Thank you, Mr. Lowe. We'll hear you on rebuttal. Thank you. Mr. Schmidt. Good morning, Your Honors. John Schmidt, representing both defendant appellees Mork and Rafferty. We start with the premise in all of these cases that they are very fact specific. I specifically with regard to the underlying facts. When you do that and you apply this court's standard of review with regard to preliminary injunctions, particularly the third item that says the ultimate decision to grant or deny the injunction is reviewed with the abuse of discretion standard. I suggest to this court that what Judge Linares and Judge Checkey did clearly overcomes any question of abuse of discretion. ADP is relying particularly on three cases to support its position here before this court that these restrictive covenant agreements, RCAs, have been enforced and that they should therefore be enforced going forward. I submit to this court that there's only one decision that was improvidently decided that has held that. The Mansure decision out of Tennessee never addressed the issue of the restrictive covenant being a restraint of trade. In Jacobs, Judge Linares did not address the decision as to whether the restrictive covenant was a restraint in trade. All right, so that's really the legal issue we have to decide. That's correct. Was it legal error to say that this restrictive covenant agreement is a restraint of trade under New Jersey law? It was not. It was never addressed in the prior cases. In Lynch-Halpin, Judge Martini addressed it, but he did so by simply paraphrasing Judge Linares in Jacobs. All right, so the president, there's no president that binds us. What should persuade us? Talk to us about principle. What should persuade you is the fact that the New Jersey court is very clear. The Supreme Court has said on multiple occasions, not only in the Solari test, but in community hospital versus more, that a restrictive covenant should be limited to protect the legitimate business interests of the employer. The covenant should be no broader than is necessary to protect those legitimate interests. All right, let's start with the easy part, what I think is the easy part. One year. That's not a problem. Okay. Geographic scope. North America is no good, right? United States is probably no good, but why wouldn't the particular state or city where the worker was located, why wouldn't that be valid? Generally speaking, geographic scope might be applicable. I suggest that in these two cases, it is not for the following reasons. One, when you look at Rafferty, she was what was considered to be a comprehensive services manager. She was an overlay. She had a territory, but she could not call the call. She could not go out and solicit any clients. She didn't need to. She had people under her doing it. She had people who would tell her where to go and what to do. She was selling one specific limited product. If the court were going to, and let's take Rafferty for a second. I'm sorry, Mork. Mork was selling to a limited market share of 1,000 employees, I think to 5,000 or 1,000 and above, in the greater Chicago area and several clients in Wisconsin. She didn't have a territory assigned to her. She was given a Salesforce database with specifically identified clients. Ultimate, she's a value to Ultimate, and Ultimate wants to poach her because Ultimate wants to get their hooks into those clients in Chicago and Milwaukee. Now, ADP is saying, look, we're not too happy you left. You went to our competitor. Good luck to you, but because of this agreement you signed for the next year, only the next year, you're not going to be able to work in this business for our competitor in Chicago and Milwaukee. If Ultimate thinks you're really talented and good, they could flip-flop Rafferty and Mork. They could say, Rafferty is Chicago for a year. Send Mork to Boston for a year. Everybody's happy, except Ultimate doesn't get to take advantage of leveraging the relationships that they had when they were working for ADP in those markets. If she was selling in the same marketplace, doing the same job she did with ADP, either one of these people, I would suggest that Your Honor is correct. But although I'm not sure I agree or disagree with Judge Moore, I think his logic in blue-penciling the restrictive covenants to, in fact, make them territorially restrictive to the job and to the market size was probably appropriate under the circumstances. He didn't address the issue. He said, I don't have to address the issue of whether this is a restraint of trade. I can narrow the restrictive covenant properly. In that case, what he did with the three cases before him, he narrowed the scope of the geographic territory to the market size and client size. So, for instance, with Karameetis, Karameetis had worked for ADP in Georgia. He was selling to a market size of 50 to 150 employees. When he went to Ultimate, he was selling at a market size in Georgia, but the market size was employers who had 200 employees or more. So Judge Moore said, we have to limit the covenant to respect the area that he could compete against ADP and hurt their clients. Okay, but... But don't you have a problem that the court here didn't make the effort to do that? It took the idea of a non-compete as just a blanket restraint of trade and held the RCA unenforceable without engaging in blue penciling. He relied on the facts that have come forward since Lynch-Halpin, facts that we have garnered in the 13 other pending, 19 other cases that have been had and discovered to date, to find that the circumstances under which this covenant was required under the Incentive Stock Award effectively fell into the laid law category. Is that because there were other restraints that came first? In other words, would you agree that this non-compete, a one-year non-compete on their geographic territory could be applied under New Jersey law to all entering employees? That's a condition of employment for you to start. That would not protect ADP's legitimate business interests. If you look at, and I think very, very appropriate language came out of the New York State Court of Appeals in the BDO Sideman case. In that case, the court said that the legitimate interest to be protected was the relationship that the accountant in that case had developed with the clients that he was assigned to work with. Simply saying you can't work in this territory when you're dealing with only a small subset of ADP's 700,000 clients is overbroad. It's not protecting a legitimate business interest. You are pushing together two discreet arguments. One is narrow and factual. One's broad. The narrow one is the particular things that Mork was doing in this one line of work are not the same as what she's doing somewhere else. That's something the district court ought to address on remand, applying the language of paragraph three of the RCA, which talks about what's the same or similar services to competing business as those which are provided to ADP while employed. We don't have a record to go into the kinds of things you want us to do to affirm on that ground. You are making a broader argument, which is you can never have a territorial non-compete because it's always sufficient to ban soliciting clients. My concern about that is the one that I raised with your adversary over here, which is if I'm ADP, how do I know when someone is using trade secrets, confidential information, working with these referral sources, et cetera? It's a bit prophylactic, but it's very common and New Jersey courts have upheld some territorial and temporal restrictions, recognizing that we can't slice this too finely here because they're never going to find out about a lot of these violations unless you just ban someone from working in the particular market with the particular line of work for a limited period of time. A year seems reasonable. As to how broad that ought to be geographically, that's probably for the district court on remand. What you have here, Your Honor, is a preliminary injunction and an abuse of discretion argument. A legal error is abuse of discretion. To Judge Bevis' point, when you're relying on abuse of discretion as appellee, what you're hoping for is factual findings in your favor because we're not going to reverse those unless they're clearly erroneous. It's an abuse of discretion to apply the wrong legal standard. Here we don't have facts. What we've got is a contract and we've got a body of New Jersey state law and we've got a district court opinion, as I read it anyway, saying this contract's invalid under New Jersey law. I guess under laid law, I guess, is your argument. He's relying on laid law. He's relying on the Cousins decisions, although they were state decisions, Cousins and the two subsequent decisions. As you said, I think quite wisely and properly informed by your decades of experience in this area, these things are fact specific. You could have two employees in the same department leaving the same employer going to another place and a district judge, a good trial judge, will perhaps blue pencil their case and not enforce the other. And that's what happened with the cases in the state court, in fact, were concluded. They were on cross motions for summary judgment. We have three pending summary judgment motions before the district courts in New Jersey. Most of these cases had been tried to conclusion before they went to the court for decision. On the preliminary I apologize. Yet you are asking us to affirm, as I understand it, based on not something fact specific, but on a categorical rule that imposing a geographic non-compete is a restraint on trade under New Jersey law. Not simply geographic restriction. What we have here is we have an RCA agreement that includes both a geographic restriction and a non-solicitation that says you can't solicit any of our 700,000 clients worldwide. When you take the combination of those that these employees were obligated to accept, and you look at the circumstances, and this is important, and this is the distinction, I think, between Linares' decision and Judge Martini's decision, because those facts weren't before the court, but we presented in certifications to the court that these were only presented to the top salespeople, those people who could most compete. So I've got two problems with your arguments. The first one is I don't think you've responded to whether the narrowly tailored ones work well enough. But second, and this is something Judge Krauss was hinting at earlier, you're narrowly tailoring, and it reserved these non-competes for a subset of its people, and it was more careful in how it drew these, because it layered it on top of non-solicitation agreements. Therefore, it's invalid. But if they imposed a blanket ban on everybody who came in, then that would be okay, even though that is more restraining of trade, and I'm very concerned about laying out a rule of law that's going to encourage a blunderbuss or shotgun rather than a rifle approach to these agreements. I'm not suggesting that if these had been required by all people at the time that they first began employment, that they would not have been potential restraints of trade. The facts we have before us, however, is that somewhere between 10 and 50 percent of the best salespeople were compelled to sign these at the time that they received their Incentive Stock Awards. They're not compelled to sign them. They choose to sign them. I apologize, Your Honor. You're absolutely right. These were not obligatory. They had the option to sign them and accept the Incentive Stock Awards. We won't get into the click rap in the whole area. That's been decided. As to that group of employees, to exceed your sales targets, as I see it, and tell me if I'm wrong, there are two ways you do that. One is that you've touched more ADP clients, so you've got a greater breadth. The other is that you have, with particular ADP clients, you've got more depth. You are very much aligned with that company. You are deep into that and business relationships, a legitimate interest on ADP's part. Your Honor said it correctly. I'm targeting those employees. Your Honor said it correctly. The limiting factor is you touch more clients. We have no issue with a restraint that says you cannot solicit business from clients that you have dealt with or obtained valuable knowledge of while working. They want to impose this so that it's across the board. You can't solicit any ADP clients regardless of whether you have any contact. In between those two extremes is a middle ground that perhaps the district court will see fit to locate if we remand the case, would it not? It would depend on the facts of the case and whether or not these people are soliciting clients because of business contacts that they had as a result of information. What's a little frustrating about the record, in my view, having done some of these, not nearly as extensively as you have, but having done some of these myself, is I want to know the details. I want to know exactly who Rafferty, who's her biggest client at ADP, who she's working with. But you can't do that on a preliminary injunction on papers without some particular factual proof. Yeah, that's part of the problem. That's why I'm suggesting that how can we not remand it is what the challenge of discretion. Was it an abuse of discretion when in the same case involving Judge Martini, this court, and this is what concerns me, Judge, in the Martini decision, this court found that if it was a permanent injunction, the RCA may have been overbroad and we probably would have blue penciled it or changed it, but it's only for 12 months and therefore we're not going to make an issue of it because we didn't think there was abuse of discretion. Well, that injunction continues today, almost three years after that. We're not hearing that. I understand that. But this is, you know, we have the purpose of an abuse of discretion. Judge Lanier has ruled with it. Maybe you've just made a compelling argument why this court, to provide some guidance to the district courts, district court in New Jersey and the judges on that district court, to implore them to make a fulsome factual record in each one of these cases. I suggest that that's obviously where we should go because they are so fact-specific. Could I ask you to respond to your adversary? I thought one of his cogent points was that the other agreements do not protect against the kind of business that comes out of referral sources. That's not true. The SRA specifically has a provision. Could you direct me to it? I have it right in front of me. I believe, if you want to, may I pull it? Sure. I have everything but the first volume of the appendix with me. If you can't find it, I'll wrap it up for you. The employee, it's... What paragraph are you on?  The SRA? I'm looking at the SRA and I think it's paragraphs... I'm sorry, your honor. It talks about... It begins with employees shall not, on the employee's behalf or on behalf of any other person. Employees shall... Was there a number before this?  Employee will not use or act in any way directly or indirectly on any information which became known to the employee? It's paragraph 4A. 4A. I've got it. The employee agrees that during the period commencing the date of the employee, and if you read further on, it talks about... Located within the territory to facilities. Employee will not disclose to any person any business methods. Communicate with any person who is a client, bona fide prospective client, or marketing partner. Marketing partner is the key, your honor, because ADP had specific marketing partners that they would have people assigned to work with. Okay, but let's just back the question up. There might be other referral sources or networks of connections that don't qualify as marketing partners within this. Is that a legitimate interest that would justify additional protection? Not if this person learned of that on their own accord without any specific input from ADP. Even if it was on ADP time while they were earning ADP salary? It's no different than the skills and knowledge you learn, as far as I'm concerned, the skills and knowledge that you learn in the course of the trade, those are clearly not legitimate interests that can be protected by a restrictive covenant. I read it differently the way Judge Krause did, which was general skills, general salesmanship, how to is fine, but this is market specific, industry specific connections, and that doesn't look like a generic blunderbuss restrained trade to me. I would suggest, to your honor, that if it is a contact that the individual himself developed that has no particular reference to ADP, for which ADP didn't provide information, didn't in fact enhance the ability of the person to learn, then that's not a marketing partner. For instance, one of the other cases we had, I think it was La Nobile, he was a CPA concentric sales representative. ADP would have him calling upon CPAs to get referrals for small business, for small businesses. And those CPAs that he learned of as a result of his specific job at ADP, I would suggest are people who could be restricted. However, if I'm out selling and in my business I simply meet Joe Smith at a optimist or rotary meeting and he happens to be a CPA who refers me a client that has nothing to do with my specific referrals from ADP, knowledge I learned specifically from ADP, that is what I consider to be the general skills and knowledge that you learn in the trade and should not be restricted. That seems to be specific to industry, to the particular expertise of an employee, to the nature of the market. And here ADP in backing off of its insistence on prospective clients, for example, has indicated that it would accede to certain blue pencil lines. At the end of the day, isn't the issue for us that we, whatever we might think are legitimate interests, we need to anticipate how the New Jersey courts would treat this. And the New Jersey Supreme Court has said in Solari and multiple times since that rather than simply holding a restrictive agreement, a non-compete or a non-solicitation agreement, unenforceable as a categorical matter, that the courts should go forward and engage in reasonable. That's something that could be done on remand, but the district court here took a per se approach that the New Jersey Supreme Court in Solari seems explicitly to say that is not the way we will approach things under New Jersey law. The court has also said that if the agreement is simply to restrain trade, it should not be enforced. And that's what both Linares, Checky, Judge McNulty in the district court, Judge Kessler found that the whole purpose of this was to restrain trade, to keep the best and the brightest sales people from going out and competing. And that the legitimate interests that ADP had were fully protected by the sales representative agreement that was signed when they came in. That they could not solicit business from any of the clients with whom they dealt. And in fact, in at least one of the cases, the first case that went to decision, the Cousins case, Judge Kessler found that Kessler had violated the terms of the SRA, even though he found that the RCA, the Restrictive Covenant Agreements, were restraints of trade and therefore unenforceable, he did enforce the SRA and he imposed a limited extension of the Restrictive Covenant in his cousins because he had solicited business from clients that he had dealt with. That's a legitimate interest to be protected. And to have an agreement such as this, and I think I suggest to the court that on a preliminary injunction you have to look at the entire document when you have, you can't solicit any clients across the board, anywhere in the world, regardless of whether you had any involvement with them whatsoever, and you can't work in any territory that you may have worked in, in works, you didn't have a territory, you just had clients assigned, but you can't work in any territory without parsing that somehow, I suggest, suggests that it's a restraint of trade. Thank you, Mr. Schmidt. Mr. Lowe, we've got him. Thank you. I'd like to start with the restraint of trade issue that Mr. Schmidt was just discussing and I think one of the critical issues, and Judge Linares found this in his Rafferty opinion, is he said, and let me start with the test, the test is the Solari test, and we start with first, is there a legitimate interest in the agreement? Judge Linares in his Rafferty opinion wrote that there is a legitimate interest in the sales representative agreement and the nondisclosure agreement, and then his concern with the RCA, the Restricted Covenant Agreement, is that he said the legitimate interest was the same. So he's saying that ADP has a legitimate interest in the RCA, but then he found it to be a restraint of trade. In essence, it added nothing. It put the employee under additional constraints without getting ADP anything else. That's what he's saying. I guess another way of saying it was gratuitous. He's saying that he's ignoring the consideration that the employee got in return for it. Well, he conceded there was consideration. He's saying that ADP doesn't have a legitimate business interest in the additional constraints. He's looking at whether ADP needs it, so he's substituting his own judgment for ADP's business judgment, when what he should be doing is looking at is there a legitimate business interest, which he acknowledged there is, and then look at the undue harm. I think this is what Judge Bevis was getting at. There's two points here. The first, the threshold matter is, is there a legitimate interest? If there is, then on the next part, the undue harm part, the result is not to say this is a restraint of trade, and I'm not going to enforce this at all. It's to blue pencil it as necessary. All of this really flows out of the application, or I would call it the misinterpretation of the Laid Law case by Judge Moore in Essex County, where, and we talked about this a bit as well, or Mr. Schmidt did, his concept that these agreements, in order to be enforceable, the RCA must be applied to all employees. But that's not the takeaway from the Laid Law case. The concern in the Laid Law case is that there were employees that were being asked to sign non-competes to get stock options who had already been exposed, in some cases, for years to confidential information. And the company in that case didn't put any protections forth at the beginning of employment to protect their confidential information. And that's not what we have here. So all of this, we submit, starts with a misinterpretation of Laid Law. But that would seem to be an even stronger case for a legitimate interest in targeting particular employees who were the most involved with a business's clients. If it was not sufficient in Laid Law, then certainly it wouldn't be here. It wasn't sufficient in Laid Law because it wasn't protected in Laid Law. That's the factual difference. They sought to protect it at a later stage of employment. And against the default of there being no protection, if there's a legitimate interest at all, it would seem to be a stronger case for that in a Laid Law situation than here, where there are already layers of protection even before mid-employment, the restrictive covenant agreement is added on. Right. I think I'm following. Here we have the initial protections, but then as the employees gain additional access to either more clients or larger clients or more knowledge of ADP's confidential information, then when they are provided the additional consideration, offered the additional consideration, in exchange they're asked to sign more restrictive covenants. I guess my point is that it may be difficult for you to distinguish Laid Law. It sounds like your argument really is Laid Law was wrongly decided. I think Laid Law has been wrongly applied. If we look at Laid Law as having a very unique set of facts, I think it's just been wrongly applied since then. And what are the key facts that distinguish Laid Law from this case or that make it not particularly helpful in this case? Well, the key fact is that there were protections in place from day one on all of ADP's employees. So there is a confidentiality restriction. There is a limited non-solicitation restriction. Those are things that were not in place. But the RCAs weren't in place. The RCAs weren't in place. But you gave new consideration for the RCAs. That's correct. The issue is not whether you have a valid contract within consideration of something that was returned. It's whether something that was returned constitutes a legitimate interest under New Jersey law. And there it seems you have a much harder case to make than in Laid Law because there already are protections. Well, I think that's almost the reverse, though, of how Judge Moore, who is really the judge that has ruled on this issue, has looked at it. I think in his view, it's because not everyone has all of these restrictions. The agreement isn't enforceable. And I think with the briefing you've said, that would be more anti-competitive. If there are additional questions, I'm happy to. All right. Thank you, Mr. Lowe. I want to thank Mr. Lowe, Mr. Schmidt, not only for an excellent argument, but for the wonderful display of collegiality regarding the documents. That's always appreciated. And I must say, based on my experience, when you've got round, I don't know, 15 of 35, that sort of collegiality is not always observed. So the court's particularly grateful for that and commends you for that. We'll take this matter under advisement.